[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action wherein the plaintiffs, Tony Genua and Sharon Fales, owners of real property in Somers, Conn., allege that the defendants, Northeast Utilities (NU) and its agent, Asplundh Tree Expert Company (Asplundh), wrongfully entered onto the plaintiffs' property and cut down several of the plaintiffs' trees. The plaintiffs allege that the CT Page 5768 defendants are liable under trespass and negligent and intentional destruction of property and claim treble damages under Connecticut General Statutes Section 52-560.
The defendants deny these allegations and, by way of special defenses, claim that the severed trees were not growing on the plaintiffs' property; that the plaintiffs released the defendants from liability; and that the defendants offered to and did replant trees in satisfaction of the plaintiffs' claims.
The court finds the following to be the facts in this case. The plaintiffs purchased the property in question in December 1986. The property comprises nearly two acres and has a residence thereon. The property was heavily wooded, and the woods surrounding the house provided excellent privacy for the dwelling in all directions. The house sits on a portion of a hilltop which affords a dramatic westerly view across the Connecticut River valley. The home is contemporary in style and contains a large number of windows. The house was purposely positioned on the parcel to maximize the western view and minimize the view of Mountain View Road, the highway which provides access to the property. The plaintiffs purchased this property in large part because of its secluded situation.
On August 21, 1987, at around 7:30 A.M., a representative of NU knocked on the plaintiffs' front door and indicated that NU wanted to alert the plaintiffs, along with other homeowners in the area, that NU needed to trim trees along Mountain View Road to accommodate NU's power lines. Genua requested to see some identification, and the representative produced a form from Asplundh. The representative asked Genua to fill out the form, but instead Genua suggested that he and the representative walk along the plaintiffs' property where it abuts Mountain View Road.
Genua pointed out to the representative that the power lines do not run along the plaintiffs' property but rather are strung along the opposite side of Mountain View Road. After confirming that these lines were, indeed, across the roadway, the representative agreed with Genua that no trimming of trees on the plaintiffs' property appeared necessary. Genua stressed to the representative that his property had had erosion problems near the road and indicated CT Page 5769 the plaintiffs objected to removal of any trees or shrubs from their land. The representative then left.
Genua was troubled by the visit, and, the following day, called NU to satisfy himself that the representative was authorized to visit his property. He spoke to a Mr. Maroski, a supervisor at NU, who visited the plaintiffs' property shortly after the phone conversation. Genua reiterated to Maroski his concerns regarding erosion, the private setting, and that the power lines did not traverse the plaintiffs' land. Maroski assured Genua that he had nothing to worry about. Genua insisted, however, that Maroski take Genua's name and phone number, and requested that he be called before any trimming on his land take place. Maroski again assured Genua that someone would notify him beforehand. Genua thereafter sent a letter to Maroski by certified mail, which letter memorialized the above discussion (Plaintiffs' Exhibits C and D).
Around 7:30 A.M., October 22, 1987, Genua was awakened by the roar of chain saws and a wood chipper being operated near his home. He quickly exited his house and observed that Asplundh workmen had just cut down nine, twenty-five to forty foot evergreen trees that were growing on the plaintiffs' land, and they had stripped another large pine tree of limbs prepatory [preparatory] to cutting it down. The felling of these trees cleared about sixty feet of the plaintiffs' frontage along Mountain View Road which totals about one hundred eighty-five feet.
Genua requested that the work cease, and the Asplundh crew complied. Genua explained that the power lines obviously ran along Mountain View Road on the other side of the street and that the plaintiffs had authorized no work to be done on their property. The workmen called their foreman to the site, and Genua called the resident state police trooper. Both the trooper and the foreman arrived at the scene.
The Asplundh foreman acknowledged that a mistake had occurred and commented, "We blew it." Unsatisfied by this oral admission, Genua asked Stephen G. Child, the general foreman, to put the admission in writing. Child agreed, and the signed and witnessed statement is Plaintiffs' Exhibit G. The written statement admits the error and promises that the CT Page 5770 plaintiff's land will be restored to its original condition by the replanting of trees. Child signed another document stating that no Asplundh crews, working as agents of NU, would work on the plaintiffs' land again (Plaintiffs' Exhibit F).
The above doings notwithstanding, a few days later, around 7:30 A.M., Genua again heard the buzzing of saws on his property. He sprang toward Mountain View Road and, to his dismay, discovered that another Asplundh crew had just felled three more large trees adjacent to the area which had been cleared out by the previous crew. Genua produced the documents he obtained from Child and demanded to know why the written promises had been breached once again. Soon the Asplundh general foreman and personnel from NU arrived. At first no one could explain how the new crew managed to return to the plaintiffs' property. After further discussion it was deduced that, while the work order directed the crews to commence tree trimming one hundred feet east of a certain utility pole which is located to the east of the plaintiffs' property where the power lines do, indeed, cross over to the same side of Mountain View Road as the plaintiffs' parcel, both crews had mistakenly started to cut one hundred feet to the west of the utility pole. This two hundred foot error caused the crews to end up on the plaintiffs' property instead of on neighboring land. After apologies the defendants employees left.
Around 7:30 A.M., a few days later, Genua detected the sound of large trucks maneuvering near his residence. Sensitized by the previous incursions, he quickly went to the roadway and observed yet another Asplundh crew clearing more vegetation from his property at the point where the earlier crews had left off. Fortunately, Genua interceded before any large trees were cut down.
During November 1987, a Mr. Duncan, the owner of Asplundh, contacted Genua and assured him the damage would be repaired to Genua's satisfaction. Later that month, without notice or permission, a nurseryman arrived with five or six, five to eight foot pine trees. Genua confronted the man and voiced his complaints regarding lack of knowledge of the replanting schedule. He also pointed out that it was already too cold and too late in the year to replant pine trees successfully. The nurseryman agreed, but suggested that he CT Page 5771 continue to plant and that the success or failure could be assessed the following spring. Genua called NU and advised that this procedure was unacceptable and wrote to Asplundh with the same message (Plaintiffs' Exhibit K). None of these transplanted trees survived the winter.
The errant cutting of the trees described above exascerbated [exacerbated] the plaintiffs' soil erosion problem at the site of the cutting. This erosion, as well as the area of cutting and the deceased transplants, are depicted by photographic evidence (Plaintiffs' Exhibits E, H and I).
The court finds that the severed trees were trees growing on the plaintiffs' land. The court bases this finding on the evidence adduced at trial including the testimony of Genua and Richard Martel, an experienced, licensed land surveyor, and supporting documentary evidence (Plaintiffs' Exhibit A and Defendants' Exhibits 1 and 2).
Each side of this litigation presented the testimony of an experienced and qualified real estate appraiser to establish the fair market value of the plaintiffs' property both before and after the felling of the trees. The plaintiffs' appraiser, Robert Morra, used the "market data" approach and valued the parcel at $246,000.00 before the trees were cut and at $234,000.00 after severance. He attributed the $12,000.00 difference, about five percent of the total value of the parcel, to the diminution of privacy and the despoiling of the view from the dwelling toward Mountain View Road. Morra personally examined the land and compared photographs of the stricken area as it appeared before and after the trees were removed.
The defendants' appraiser, Edward T. Lynch, attributed no reduction in fair market value to the removal of the trees. He ascribed a "nominal" value of $500.00 to the unsightly presence of the dead transplanted trees. Lynch also personally viewed the site and indicated that the additional remaining trees are sufficient to maintain satisfactory privacy and view and thus no additional reduction in fair market value was incurred.
The court, having considered all the evidence in the case, including the appraisal reports of Morra and Lynch (Plaintiffs' Exhibit B and Defendants' Exhibit 3), finds that CT Page 5772 the loss of the trees cut down by the defendants' agents diminished the fair market value of the plaintiffs' property by $5,000.00. The destruction of the line of mature trees lessened the privacy available at the site by allowing greater observation of the plaintiffs' house and curtilage than existed before the elimination of the trees. The absence of the stately evergreens for about sixty feet creates a sudden gap in the treeline which scene is less attractive when viewed from the street toward the dwelling, and vice versa, than existed previous to the gap. However, the court feels that the loss of privacy and view is not so great as Morra determined. As the trier of fact in this case, the court may accept or reject any part or all of the testimony of appraisers when ascertaining fair market value, Eichman v. J. and J. Building Co., 216 Conn. 443 (1990), pp. 450 to 452.
 I
Connecticut General Statutes Section 52-560 does not create an independent statutory right of action but rather prescribes the measure of damages where compensatory damage would, in the absence of the statute, be recoverable, Avery v. Spicer, 90 Conn. 576 (1916), p. 583. Thus, the plaintiffs must prove that a trespass, or other common law tort, has occurred as a predicate to the invocation of the multiple damages provisions of Connecticut General Statutes Section 52-560. The court finds that the plaintiffs have proven that the defendants are liable for the trespass to their land by a preponderance of the evidence.
In order for a plaintiff to recover in an action for trespass of real property, he must show that he has legal possession of the premises, Connecticut Law of Torts, Section 16, p. 22. Here, plaintiffs owned and resided on the parcel of land upon which the severed trees stood. Genua consistently asserted his right to possession by confronting the defendants and their employees whenever they intruded on the property. The defendants' agents' actions amount to an admission of the plaintiffs' right to possession. The representative of NU visited the plaintiffs seeking permission to work on the parcel at the outset. The documents signed by the Asplundh's general foreman amounts to a concession of the plaintiffs' possession. The evidence well established the plaintiffs possession and ownership of CT Page 5773 the property.
Nor can it be seriously doubted that the defendants, through their agents and employees, on three occasions invaded the plaintiffs' land, without permission, and caused damage thereon by the clearing of the trees and brush. Because the doctrine of "qui facit per alium, facit per se" applies under Connecticut General Statutes Section 52-560, Banks v. Watrous, 134 Conn. 592 (1948), p. 600, and Doran v. Rugg, 22 Conn. Sup. 189 (1960), p. 192, there can be no doubt that both NU and Asplundh are liable for the intrusions of each other and their work crews.
Also, the court finds that the plaintiffs never released the defendants from liability for these intrusions, nor did the planting of the five pine trees on their property constitute constructive release. As noted above, the plaintiffs objected to this planting, refused to execute the form submitted to them by the defendants for the purpose of effecting satisfaction of the plaintiffs' claims, and promptly notified the defendants of this refusal.
The remaining issue to be resolved is whether, the treble damages provision of Connecticut General Statutes Section 52-560 applies or whether the "honest mistake" exception limits the plaintiffs' recovery to the reasonable value of the felled tree. In this regard the statute reads as follows:
 "Any person who cuts . . . any trees . . . standing . . . on the land of another . . ., without license of the owner, and any person who aids therein, shall pay to the party injured . . . three times the reasonable value of any . . . tree . . .; but when the court is satisfied that the defendant was guilty through mistake and believed that the tree . . . was growing on his land, or on the land of the person for whom he cut the tree . . . it shall render judgment for no more than its reasonable value."
 A
The burden to prove that the trees were cut as a result of an honest mistake, within the meaning of the statute, is on the defendants, Petroman v. Anderson, 105 Conn. 366
CT Page 5774 (1926), p. 368; and Doran v. Rugg, supra. In order to avoid treble damages the defendants must prove, by a preponderance of the evidence, not only that the plaintiffs' trees were cut down by mistake but the "further specific affirmative belief" that the trees were either growing on the defendants' land or the land for whom the trees were cut, Doran v. Rugg. Ibid., p. 195. It is not merely the existence of any honest mistake which relieves a defendant under the statute of liability for treble damages, but "the existence of some mistake plus the affirmative belief," specified by the statute, Ibid., (emphasis added).
In this case neither NU nor its agent, Asplundh, claim to have believed that the plaintiffs' property, upon which the severed trees once stood, belonged to NU. Rather, Asplundh cut the tree on behalf of NU, and NU wished to remove the trees to accommodate power lines. Thus, the mistaken belief was not as to NU's ownership of the land, but as to whether NU had authority or permission from whoever owned the land to remove the trees growing thereon. Therefore, neither NU nor Asplundh fall within the saving clause of Connecticut General Statutes Section 52-560 because neither believed that the trees were growing on NU property.
 B
The measure of damage under Connecticut General Statutes Section 52-560 is based on the value of the trees removed or the dimunition [diminution] of the land resulting from the destruction of the trees, Maldonado v. Connecticut Light and Power Co.,31 Conn. Sup. 536 (1974), pp. 539 and 540. In the present case, the court has found that the fair market value of the property was reduced by $5,000.00 as a result of the cutting of the trees by the defendants. The plaintiffs introduced no evidence regarding the value of the severed trees as lumber or firewood or similar purpose.
In their post-trial brief, the defendants contend that the treble damages provision of Connecticut General Statutes Section 52-560 is inapplicable to the instant case because the plaintiffs have elected to pursue damages purely based on the dimunition [diminution] of their land rather than on the value of the timber as timber. The statute itself, however, makes no such distinction. The language of the statute sets the recoverable damages at "three times the reasonable value of CT Page 5775 any tree."
The defendants' argument misconstrues the holding of Maldonado, supra. That case does not create alternative measures of damage in cases arising out of Connecticut General Statutes Section 52-560. Rather, it recognizes alternative methods of valuation of those damages. In the case sub judice the reasonable value of the felled trees was their aesthetic value, i.e. the value the trees had by way of privacy and visual beauty. Section 52-560 neither expressly nor impliedly limits treble damages to those cases where the severed trees have value as chattel.
Because the court has found that the reasonable value of the trees which were removed by the defendants to be $5,000.00, in that their removal reduced the fair market value of the plaintiffs' property to that extent, the court finds for the plaintiffs on each count of the complaint and awards treble damages in the amount of $15,000.00.
BY THE COURT,
Samuel J. Sferrazza Judge, Superior Court